E-FILED
Thursday, 19 July, 2007  12:37:17 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| **BRUCE TURNER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No. 05-CV-2241** |
| ) | |
| **ARCHER-DANIELS-MIDLAND** ) | |
| **COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#27) filed by

Defendant, Archer-Daniels-Midland Company (ADM).  This court has carefully reviewed the

arguments of the parties and the documents provided by the parties.  Following this careful and

thorough review, ADM's Motion for Summary Judgment (#27) is GRANTED.

## FACTS[1]

Plaintiff, Bruce Turner, is African American and was hired by ADM in 1988.  Plaintiff

worked at the East Plant in Decatur, Illinois.  Matt Philips has been the Plant Manager at that

location since November 2001.  Theresa Verderber was the Human Resources Manager from April

2002 to November 2004.  Fred Kelm was the Department Superintendent and Isiah Johnson, who

is African American, was Plaintiff's shift foreman.  Plaintiff was a member of the union and his

employment was covered by the collective bargaining agreement between ADM and the union.  The

substance abuse policy included in the collective bargaining agreement stated:

The Company will require testing of all employees covered by this

---

[1]  The facts recited are taken from the parties' statements of undisputed facts and the documents submitted by the parties, including deposition transcripts.  This court has only included facts which are supported in the record.

Policy. Fitness for Duty Evaluation, blood test, urinalysis, or other drug/alcohol testing of employees whom the Company has reasonable cause to suspect of using or being under the influence of a drug/alcohol/inhalant while at work or on Company property or on Company business may also be required. This may include an employee who has been involved in a plant accident.

Under the heading "Disciplinary Action" the policy stated, in pertinent part:

An employee's refusal to consent to a drug/alcohol search, Fitness for Duty Evaluation, a drug/alcohol test under the provisions of this policy, or a refusal to authorize the release of either medical information relevant to the impairment or test results to the Company may result in termination, even for a first refusal.

An employee found to be "under the influence" as described in this Substance Abuse Policy will be immediately relieved from any duty and referred by the Company to a professional counselor for evaluation. Failure of the employee to promptly enter treatment if recommended by the counselor and to successfully complete such treatment (including treatment on an on-going basis) will result in termination of employment. Should a counselor determine that treatment is unnecessary, then the employee may be subject to a disciplinary suspension and a second such occurrence of being found to be "under the influence" may result in termination of employment.

2

It is undisputed that Plaintiff received a copy of ADM's substance abuse policy.  At his deposition, Plaintiff was asked whether he knew "if you were properly requested to take a drug and alcohol test by the company and you refused, that that could be grounds for your discharge," and responded, "Yes."

On December 19, 2002, Plaintiff filed a charge of discrimination against ADM, alleging that ADM denied him a promotion based upon his race.  On August 1, 2003, Plaintiff filed a second charge of discrimination, contending that ADM denied him two additional promotions based upon his race.  On September 19, 2003, Plaintiff, along with four other African American ADM employees, filed a lawsuit in this court.  In January 2004, that lawsuit was consolidated with Joyner, et al. v. ADM, Case No. 03-2177, also pending before this court.  After the consolidation, the Joyner case involved a total of nine plaintiffs, all African American employees of ADM, and alleged class and individual claims of race discrimination.  It is undisputed that Philips and Verderber were aware of the Joyner lawsuit, which included Plaintiff's allegations of racial discrimination.

On January 15, 2004, Plaintiff was working third shift, which was the night shift.  Plaintiff was told there was going to be a safety meeting at 1:30 a.m.  Plaintiff was working in the soy isolate packaging building, and the meeting was going to take place in the annex building.  There are steps to walk down when exiting Plaintiff's building, and between the two buildings is an outdoor truck bay, which consists of three docks where semi-trailers can back up.  The night of January 15, 2004, Plaintiff saw a flat bed truck in the second dock as he walked down the steps on his way to the safety meeting.  The truck was not backed into the dock, so the front of the truck was facing the dock.  Plaintiff testified that, when he saw it, the truck was unattended and not running.  Plaintiff also stated that a long trailer was in the first dock.  Plaintiff testified that, after he came down the steps,

and as he was almost to the annex area, he heard the back-up horn of the flat bed truck.  He testified

that, as he turned to see where it was, the truck hit him on his left side elbow.  Plaintiff clarified that

he was wearing earplugs and earmuffs at the time and heard the back-up horn just as the truck hit

him.  Plaintiff testified that he rolled on the ground after he was hit and was in a lot of pain.

     Terry Schum, a millwright in the maintenance department, was driving the flat bed truck the

night of the accident.  Schum testified that he and a co-worker had loaded a pump onto the truck

after it had been repaired.  Schum testified:

> Best of my recollection, I loaded the pump up and I got in the
>
> truck and started it, turned the lights on, put it in reverse, looked over
>
> to my left because people come from that direction, looked over to
>
> my right because people come from our maintenance shop, I turned
>
> around, backing up slowing, and I caught something out of the corner
>
> of my eye on the left-hand side of the bed.  It was kind of obscured
>
> from my vision, like a person fell or something.  And I stopped all of
>
> a sudden.  And that's when I seen Mr. Turner laying on the ground.

Schum testified that the rear window of the truck was dirty and his view was obscured by the dirt.

Schum also testified that he had been reversing about 10 to 15 seconds before he hit Plaintiff.  After

the accident, Schum apologized to Plaintiff for hitting him.

     Johnson, Plaintiff's supervisor, believed that Plaintiff should be taken to the hospital for

observation and treatment.  Kari Muma, the security officer who was on duty at that time, drove

Plaintiff to Decatur Memorial Hospital.  Prior to Muma taking Plaintiff to the hospital, Johnson gave

Muma a form to give to the medical personnel requesting that Plaintiff be tested for drugs and

alcohol.  Johnson also drove to the hospital in his own vehicle and subsequently saw Plaintiff at the hospital.  Schum was not injured, did not require medical attention, and remained at work for the remainder of his shift.

When Plaintiff arrived at the emergency room of the hospital, a nurse asked him what had happened and Plaintiff explained he had been hit by a flat bed truck.  The nurse asked Plaintiff questions about his medical history, and he told her that he had had two pulmonary embolisms and that he was taking Coumadin, which he testified is a blood thinner for clotting factors.  Plaintiff testified that he was concerned that he could experience another blood clot.  The nurse took Plaintiff's vital signs, including his blood pressure and temperature.  A nurse or physician also examined Plaintiff's elbow.  Plaintiff testified that the nurse then asked him to take a drug test.  Plaintiff testified that "at no time did she tell me that ADM was requesting for me to do a drug test." Plaintiff testified that he told her, "I want to be treated for my medical condition first and I'm not refusing to do a drug test."  Plaintiff testified that "[s]he was very persistent about a drug test." Plaintiff testified that "me and that nurse, I would call, kind of got into a little exchange of words." Plaintiff stated:

> She kept insisting about a drug test, and I kept insisting that I wanted to be treated for my blood condition problem which I thought that she was not taking seriously due to my condition.  And she made a round-about remark that I had never had anyone to refuse a drug test.  And I yelled back at her as she was walking away, I said, once again, I'm not refusing to do a drug test, but this is your first one.

Plaintiff testified that, later, a physician came into the room and she asked him to do a drug test.  Plaintiff testified that the physician never said that ADM was requesting the blood test. Plaintiff testified that "I replied to her I wanted to be treated for my medical condition and I'm not refusing to do a drug test."  Plaintiff testified that the medical personnel should have administered a ProTime and a CAT scan, but did not.  Plaintiff testified that he did not ask for these tests but felt that the medical personnel should have "automatically known" to give him those tests.

The record shows that Plaintiff's signature is on a form titled "<u>REFUSAL TO CONSENT FOR TREATMENT</u>" which also includes the signatures of two witnesses.  The form states:

> I request that no Drug Screen be performed or administered to
> Turner, Bruce Kevin . . . during this hospitalization.  I hereby release
> the hospital, its personnel, and the attending physician from any
> responsibility whatsoever for unfavorable reactions or any untoward
> results due to my refusal to permit the performance or administration
> of Drug Screen . . . and I fully understand the possible consequences
> of such refusal on my part.

Plaintiff testified that he "signed a document believing that that document was a document for treatment."  He testified that the nurse told him "there is nothing in here saying that you refused to do a drug test."  Plaintiff also testified that he "was in a lot of pain and . . . did not read it."

Plaintiff testified that he was x-rayed, that his arm was put in a sling and that they prescribed some type of aspirin for the pain.  It is undisputed that Plaintiff left the hospital without taking a drug and alcohol test.  Plaintiff testified that he saw Johnson at the hospital and also saw Ed Stocker, a co-employee who was there as a friend.  Plaintiff testified that Johnson was never in the room with

6

him and did not tell him that ADM was requesting the drug test.  Plaintiff testified that he had a brief conversation with Stocker as he was getting ready to leave the hospital.  Plaintiff testified that Stocker "mentioned about a drug and alcohol test" and that he replied "that no one was requesting for me to do a drug and alcohol test."  Plaintiff further testified that he told Stocker "no one had asked me to do a drug and alcohol test, and I was willing to do.  I wanted to be treated for my medical condition."  He testified that he believed that it was only the hospital requesting the drug test.  The hospital released Plaintiff to return to work, but he did not return to work.  Plaintiff testified that he was willing to go back to his job but Johnson told him "due to the swelling of your elbow, there is no work for you to do, go home."

The next morning, Philips and Verderber met with Johnson.  Johnson gave them a written statement.  In his affidavit, Philips stated that the written statement is a business record that is kept in the ordinary course of ADM's business.  Johnson's statement said, in pertinent part:

> When I got there [the hospital] Bruce was in a room with two people, one was getting information from him and the other one was examine [sic] his left arm.  I went to the waiting room.  At about 2:20 am I heard Ed Stocker come in, I got up to see what he wanted.  He had went to the room [where] Bruce was.  About this time a person came in and told Bruce that she was there to give him his drug test, Bruce said he was not going to take it, she asked again and he said no.  Another person came in and asked Bruce to take the drug test, he said no.  I told Bruce he need [sic] to take the drug test, he said he was not going to take it.  Ed Stocker told Bruce he needs to take it, he said no.

7

Ed Stocker said Bruce if it was me I would take the test, he said no
again.  A person came in and had Bruce sign a paper stating that he
refuses to be tested.  They took Bruce to the X-Ray room.  They
came back and said that there was nothing broken and that he could
go back to work with restricted duty and to see Dr. Still in the
morning.  Bruce told them he was going to see his Dr. first[.] [T]hey
told him that, that was up to him.  I told him I could not let him work
because he did not take the drug test, he said he knew that, I also told
him that he could not come to work until he take the drug test.  We
called for the Rover to come and take him back to the plant, and then
he went home.

Verderber testified that Johnson told her and Philips that he told Plaintiff that Plaintiff needed to
take the drug test and that refusing could result in the loss of his job.  Philips and Verderber both
testified that Johnson told them that Plaintiff still refused to take the drug test even after Johnson
gave him this warning.  Johnson also provided Philips and Verderber with the form Plaintiff signed
at the hospital.  In his affidavit, Johnson stated that he now works at ADM's Milling Plant in
Jackson, Tennessee.  He stated that, following the accident, Plaintiff told him that he saw the truck
and heard its reverse alarm before it hit him.  Johnson stated that he decided there was reasonable
suspicion to test Plaintiff for drugs and alcohol because he thought the circumstances surrounding
the accident were suspicious.  Johnson stated that Plaintiff refused to take a drug test at the hospital,
even after Johnson told Plaintiff that ADM was requesting the drug test and he could lose his job
if he refused to take the test. Johnson also stated that a "person then came into the room and asked

8

[Plaintiff] to sign a form stating that he refused to be tested for drugs and alcohol" and that he saw Plaintiff sign that form. Johnson stated that he told Plaintiff that he could not let Plaintiff return to work because he did not take the drug and alcohol test. Johnson stated that he gave this information to Philips and Verderber and also gave them a copy of the refusal form Plaintiff signed and a copy of the written statement he prepared regarding the incident. It is undisputed that no one, including Johnson, told Philips and Verderber that Plaintiff appeared to be under the influence of drugs or alcohol following the accident. It is also undisputed that Johnson was not aware that Plaintiff had filed a charge of discrimination or a lawsuit against ADM. In fact, Plaintiff admits that he never discussed his charges of discrimination or the Joyner litigation with Johnson.

Verderber testified that, after talking to Johnson, she called the hospital and spoke with an emergency room nurse who confirmed that Plaintiff refused to take the drug and alcohol test. Verderber testified that the nurse advised her that, prior to Plaintiff's refusal, medical personnel had provided Plaintiff with medical care. Verderber testified that she relayed this information to Philips. Philips and Verderber also talked to Schum, who told them that the truck's lights were on and he was not driving fast or erratically. Verderber testified that Schum said he was going very slow. Schum also told them that the reverse alarm on the truck was operating properly. Schum told Philips that he did not know if he hit Plaintiff or if Plaintiff walked into the truck. During the meeting with Schum, Philips discovered that Schum had not been tested for drugs or alcohol. In Philips' opinion, Schum's supervisor, Don Hansen, should have requested that Schum take a drug and alcohol test immediately after the accident. Philips then asked Schum to take a drug test and Schum immediately complied. Schum had not been off ADM property prior to taking the test, and the test result was negative. Schum took the drug test around 8:30 a.m., approximately seven hours after

the accident involving Plaintiff.

Plaintiff testified that he went to see his physician at 9:00 that morning.  Verderber testified that Plaintiff's physician, Dr. Still, is the ADM company doctor.  Plaintiff testified that his physician ordered tests and changed his Coumadin doses to make his blood thinner.  Plaintiff testified that his doctor then called Philips.  Philips asked to speak to Plaintiff and told him to come directly out to ADM.  Plaintiff testified that, prior to meeting with Philips, he spoke to Jeff Taylor, the chief union steward.  Plaintiff testified that he "heard something mentioned about some drug test, or something."  Plaintiff testified that he said, "what drug test?  No one asked me to do a drug test."

At approximately 10:30 a.m., Plaintiff met with Philips, Verderber, Kelm, and Taylor.  Plaintiff told them that when he went to the hospital, the medical personnel wanted him to take a drug test but that he wanted to have his needs addressed.  In his affidavit, Philips stated that he did not believe this was true since Johnson had told Philips, and the nurse had confirmed, that Plaintiff was treated by medical personnel prior to being asked to take the drug and alcohol test.  Philips testified that "I relied on the professionalism of the people who were giving medical treatment that they knew whether Mr. Turner's condition was such that they couldn't take 15 minutes to do a drug test."  During the meeting, Plaintiff offered to take a drug test.  Philips rejected this offer because the accident occurred approximately nine hours earlier, Plaintiff had been away from the plant nearly that entire time, and Plaintiff had received medical treatment.

After meeting with Plaintiff, Verderber recommended that Plaintiff's employment should be terminated, and Philips made the decision to terminate his employment.  Philips then told Plaintiff he was terminated for refusing to take a drug test.  Plaintiff took a drug test, at his own expense, that afternoon.  The results were negative.  Philips testified that he did not reconsider his decision to

terminate Plaintiff's employment after receiving the results of the drug test because he did not terminate Plaintiff based on the results of a test, he terminated Plaintiff's employment because Plaintiff refused to take the test.

Following his discharge, Plaintiff filed a grievance with his union. The grievance was denied and the matter was submitted to arbitration. The arbitrator ruled in ADM's favor, finding that Plaintiff refused to take the drug test, and therefore, "the Company's discharge of the Grievant was not arbitrary, capricious or discriminatory and was permissible under the Agreement." However, Plaintiff did receive unemployment benefits following his termination. The Department of Employment Security rejected ADM's contention that Plaintiff was discharged for misconduct, instead finding that no one told Plaintiff that ADM was requesting that he take a drug test at the hospital.

Plaintiff filed a new charge of discrimination regarding the termination of his employment. While this charge was pending, the <u>Joyner</u> case had proceeded to discovery on the issue of class certification. Following the class phase of discovery, the plaintiffs in <u>Joyner</u> withdrew their class allegations on February 8, 2005. On February 22, 2005, the plaintiffs in <u>Joyner</u> filed an Amended Complaint based upon individual allegations of racial discrimination against ADM. Subsequently, Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission regarding his charge that his termination was based upon discrimination and retaliation. Plaintiff filed his Complaint (#1) in this case on October 26, 2005. In Count One, Plaintiff alleged that his termination was based upon discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended. In Count Two, Plaintiff alleged that his termination was based upon discrimination, in violation of 42 U.S.C. § 1981. In Counts Three and Four, Plaintiff alleged that

his termination was based upon retaliation, in violation of Title VII and 42 U.S.C. § 1981.

On January 13, 2006, Plaintiff filed a Motion to Consolidate Cases (#9) and asked this court to consolidate this case with the pending Joyner litigation. ADM opposed the requested consolidation (#11). On February 15, 2006, Magistrate Judge David G. Bernthal entered an Order (#12) denying the Motion to Consolidate. Judge Bernthal found that there were more differences than common questions in the two cases and that consolidation could result in prejudice to the parties. Judge Bernthal concluded that each claim should stand on its own.

On July 6, 2006, ADM filed nine separate Motions for Summary Judgment in the Joyner case, a separate motion for each of the plaintiff's claims, including Plaintiff Turner. The plaintiffs filed nine separate Responses, and ADM filed nine Replies. This court carefully considered and analyzed the arguments and voluminous documents presented by the parties, including deposition transcripts from the many depositions taken in the case. On February 2, 2007, in a 73-page Opinion, this court concluded that none of the plaintiffs had shown that a genuine issue of material fact existed as to any of their claims. Summary judgment was therefore entered in favor of ADM and the Joyner case was terminated. No appeal was filed by any of the plaintiffs.

On March 29, 2007, ADM filed a Motion for Summary Judgment (#27) and a Memorandum in Support (#28) with supporting exhibits in this case. On April 24, 2007, Plaintiff filed his Opposition to Defendant's Motion for Summary Judgment (#31), with supporting exhibits (#30, #32, #33). On May 10, 2007, ADM filed its Reply (#35) and supporting exhibits (#36).

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Kodl v. Bd. of Educ., Sch. Dist. 45, Villa Park</u>, ___ F.3d ___, 2007 WL 1583989, at *3 (7th Cir. 2007). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." <u>Michas v. Health Cost Controls of Ill., Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000), <u>quoting</u> <u>Pipitone v. United States</u>, 180 F.3d 859, 861 (7th Cir. 1999). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Burwell v. Pekin Cmty. High Sch. Dist. 303</u>, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002); <u>see also</u> <u>Adams v. Wal-Mart Stores, Inc.</u>, 324 F.3d 935, 938 (7th Cir. 2003). Speculation, however, is not the source of a reasonable inference. <u>See</u> <u>Burwell</u>, 213 F. Supp. 2d at 929, <u>citing</u> <u>Chmiel v. JC Penney Life Ins. Co.</u>, 158 F.3d 966, 968 (7th Cir. 1998).

Therefore, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 248. Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." <u>Koszola v. Bd. of Educ. of City of Chicago</u>, 385 F.3d 1104, 1111 (7th Cir. 2004). The "non-moving party must present definite, competent evidence to rebut the summary judgment motion." <u>Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park</u>, 2006 WL 2192014, at *4 (N.D.

13

Ill. 2006), aff'd, 2007 WL 1583989 (7th Cir. 2007). It is true that the summary judgment standard

is applied with special scrutiny to employment discrimination cases, which often turn on the issues

of intent and credibility. Michas, 209 F.3d at 692. However, even in an employment discrimination

case, neither the mere existence of some alleged factual dispute between the parties nor the existence

of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary

judgment. Michas, 209 F.3d at 692.

## II. DISCRIMINATION CLAIM

In his Complaint, Plaintiff claimed that he was terminated based upon his race. ADM argues

that it is entitled to summary judgment on this claim because Plaintiff cannot establish a prima facie

case of discrimination and, even if he could, he cannot show that Philips' reason for firing him is

a pretext for discrimination. ADM contends that Plaintiff cannot dispute the fact that Philips

honestly believed that Plaintiff refused to take a drug test after Johnson warned him he could be fired

if he refused. This court agrees with ADM.

In order to establish a prima facie case of discriminatory discipline, a plaintiff must establish

that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he

suffered an adverse employment action; and (4) the employer treated similarly situated employees

outside the protected class more favorably. Lucas v. Chicago Transit Auth., 367 F.3d 714, 728 (7th

Cir. 2004). If a plaintiff passes this hurdle, the burden shifts to the defendant to articulate a

legitimate, nondiscriminatory reason for its action, "which if believed by the trier of fact, would

support a finding that unlawful discrimination was not the cause of the employment action." Sublett

v. John Wiley & Sons, Inc., 463 F.3d 731, 737 (7th Cir. 2006), quoting St. Mary's Honor Ctr. v.

Hicks, 509 U.S. 502, 507 (1993). At that point, the plaintiff resumes his original burden of proof

14

and must establish by a preponderance of the evidence that the defendant's proffered reasons are pretextual.  Sublett, 463 F.3d at 737.

In this case, ADM has only challenged Plaintiff's ability to establish the fourth element of his prima facie case.  ADM is correct that, to the extent that a plaintiff claims that he was subject to disparate punishment, he "must establish that he received dissimilar-and more harsh-punishment than that received by a similarly situated employee who was outside the protected class."  Lucas, 367 F.3d at 728.  In determining whether employees are similarly situated in disciplinary cases, the plaintiff must show that he or she is similarly situated with respect to performance, qualifications and conduct.  Ezell v. Potter, 400 F.3d 1041, 1049 (7th Cir. 2005); Peele v. Country Mut. Ins. Co., 288 F.3d 319, 330 (7th Cir. 2002).  "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  Ezell, 400 F.3d at 1049-50, quoting Peele, 288 F.3d at 330.

However, the Seventh Circuit has recently emphasized that "the similarly situated inquiry is a flexible one that considers 'all relevant factors, the number of which depends on the context of the case.'"  Humphries v. CBOCS West, Inc., 474 F.3d 387, 405 (7th Cir. 2007), quoting Radue v. Kimberly Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000).  "As to the relevant factors, an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity."  Humphries, 474 F.3d at 405, quoting Radue, 219 F.3d at 618; see also Goodwin v. Bd. of Trs. of Univ. of Ill., 442 F.3d 611, 619 (7th Cir. 2006).  The "purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent

15

variable," which, in this case, is racial discrimination.  See Humphries, 474 F.3d at 405.  The inquiry simply asks whether there are sufficient commonalities between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination.  Humphries, 474 F.3d at 405.

In his Opposition to the Motion for Summary Judgment, Plaintiff has presented evidence regarding five employees he claims were similarly situated and were treated more favorably: Michael Wilder, Aaron Beasley, Wayne Adams, Terry Schum and Robert Cox.[2]  Wilder and Beasley are African American and are therefore not outside the protected class.  As far as the remaining potential comparators, the evidence shows that Wayne Adams, who is Caucasian, appeared as if he might be intoxicated while at work on September 4, 2001.  Kelm asked him to submit to a fitness for duty test.  Rather than submit to the test, Adams quit.  The following day, Adams returned to ADM to ask for his job back.  He also admitted he had been under the influence of alcohol the previous day.  The Plant Manager at that time, Jim Starling, suspended Adams for 14 days and required Adams to sign a continued employment agreement, which required him, among other things, to submit to random drug tests and meet with an employee assistance counselor.  It is undisputed that Philips did not become Plant Manager until November 2001 and was not involved in this decision.  However, on April 10, 2002, Philips terminated Adams' employment for violating his continued employment agreement.

As previously recounted, Schum, who is Caucasian, was involved in the accident with Plaintiff on January 15, 2004.  Schum was not asked to take a drug test until after his shift ended

---

[2]  This court notes that ADM has objected to much of Plaintiff's evidence as unauthenticated and inadmissible.  However, this court has considered this evidence in the interest of determining whether Plaintiff has adequately shown that these individuals are similarly situated.

around 7:30 a.m. and took a drug test about seven hours after the accident occurred. Schum agreed to take the drug test and was not disciplined. The evidence shows that, sometime in 2003, Cox, who is also Caucasian, failed a drug test. Philips and Verderber made the decision not to terminate his employment, but instead imposed a 14-day suspension.

Plaintiff contends that he has shown that Adams, Schum, and Cox are similarly situated and has, therefore, established a prima facie case of discrimination. Plaintiff argues that Adams was treated more favorably because, even though he refused to take a drug test, he was not terminated and was suspended instead. Plaintiff argues that Schum was treated more favorably because he was allowed to take a drug test approximately seven hours after the accident while Plaintiff, who offered to take a drug test at nearly the same time, was terminated. Plaintiff contends that Cox was treated more favorably because he was suspended rather than terminated even though he failed a drug test.

ADM has argued that Adams was not similarly situated because the decision to suspend him after he refused to take a drug test was made by the prior plant manager, Starling, rather than Philips. In fact, Adams was subsequently terminated after Philips became the plant manager. This court agrees that dealing with the same "decision-making personnel" is an important consideration in determining whether an employee is similarly situated. See Humphries, 474 F.3d at 405. Therefore, this court concludes that Plaintiff has not shown "substantial similarity" between himself and Adams. See Humphries, 474 F.3d at 405. This court notes that, in Humphries, the Seventh Circuit concluded that a co-worker was a "sufficient comparator" to the plaintiff where the co-worker and the plaintiff, among other things, shared the "same ultimate decisionmaker." Humphries, 474 F.3d at 406. That is not the situation regarding Adams and Plaintiff.

While this court recognizes that the similarly situated inquiry is a flexible one, this court also

17

concludes that Plaintiff has not adequately shown that there are sufficient commonalities between Plaintiff and the other would-be comparators, Schum and Cox.  See Humphries, 474 F.3d at 405. This court agrees with ADM that Schum cannot be considered similarly situated because it is undisputed that he immediately agreed to take a drug test when he was requested to do so.  Plaintiff argues that Schum was not given the drug test until hours after the accident and contends that he should have been allowed to take a drug test when he offered to do so shortly after Schum was tested.  However, Schum did not refuse to take a drug test and Philips had information from which he concluded that Plaintiff refused a drug test on several occasions.  This court further concludes that Plaintiff has not shown that Cox was similarly situated.  Cox failed a drug test and was suspended rather than terminated.  In his Supplemental Affidavit, attached to ADM's Reply Memorandum, Philips stated:

> ADM negotiated and reached agreement with the Union that it will treat employees who refuse to take a drug test more harshly than employees who test positive for drugs or alcohol.  Therefore, section 6 of the substance abuse policy states that an employee who tests positive will be deemed "under the influence."  Section 7 of the policy states that an employee who is deemed under the influence will be suspended and referred to a professional counselor for evaluation and possible treatment.  An employee who is deemed under the influence a second time may be terminated.  In comparison, under the policy, an employee who refuses to take a drug or alcohol test may be terminated for a first refusal.

18

Philips further stated:

> The rationale for the difference is that if ADM did not
> severely discipline refusals, it believes few employees would submit
> to a test when requested, resulting in the inability to test employees
> and insure a safe working environment.  Furthermore, rather than
> terminating them, ADM helps to rehabilitate employees who test
> positive by requiring them to seek counseling and comply with the
> counselor's treatment recommendations.  However, ADM believes
> it cannot help an employee who refuses to even take a test because it
> does not know if the employee may have a drug or alcohol problem
> for which they need help.

This court therefore concludes that, based upon the policy included in the collective bargaining
agreement, employees who refuse to take a drug test are treated differently from employees who fail
a drug test.  Therefore, Cox is not similarly situated to Plaintiff.

However, even if this court assumes that Plaintiff could show that a similarly situated
employee outside of the protected class was treated more favorably, ADM has articulated a
legitimate, nondiscriminatory reason for its decision to terminate Plaintiff's employment.  ADM
states that Philips terminated Plaintiff's employment because "Plaintiff repeatedly refused to take
a drug and alcohol test following his involvement in a suspicious workplace accident."  In his
affidavit, Philips stated that he believed it was appropriate to terminate Plaintiff's employment
because he refused to take a drug and alcohol test in violation of ADM's substance abuse policy.

Plaintiff claims that the reason given by ADM is clearly pretextual.  Plaintiff states that the

evidence shows that he did not know that ADM was requesting the drug test and that he did not refuse to take the drug test, he was concerned about his medical condition and wanted to be treated first.[3]   Plaintiff also contests ADM's contention that the workplace accident was suspicious, specifically questioning the method used for investigating the accident and arguing there was no real basis for suspecting that Plaintiff was at fault, considering that it was dark at the time of the accident, Plaintiff was wearing ear plugs and earmuffs, and Plaintiff suffered injuries.  Plaintiff notes that it is undisputed that he did not appear under the influence of drugs or alcohol following the accident.

This court concludes, however, that it is essentially undisputed that, at the time he made the decision to terminate Plaintiff's employment, Philips had been informed that Johnson had decided that Plaintiff should undergo a drug test, that Plaintiff refused a drug test at the hospital even after Johnson told him he could lose his job if he refused to undergo a drug test, and that Verderber had confirmed with the hospital that Plaintiff had undergone treatment and then refused to take a drug test.  Philips had also been given the form Plaintiff signed at the hospital which stated that he refused a drug screen.

In order to show pretext, Plaintiff must show that Philips' reason for firing him was a "lie, specifically a phony reason for some action."  See Sublett, 463 F.3d at 737.  In order to demonstrate a material issue of fact as to pretext, Plaintiff must show that "1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible."  Sublett, 463 F.3d at 737, quoting Hudson v. Chicago Transit Auth., 375 F.3d 552, 561 (7th Cir. 2004).  This court's inquiry is whether ADM's

---

[3]   This court notes that, even considering the evidence in the light most favorable to Plaintiff, some of Plaintiff's testimony on this subject is internally inconsistent and somewhat implausible.  However, this court wants to make it clear that it is not making any credibility determinations in ruling on the motion for summary judgment.

proffered reason for terminating Plaintiff was a lie to cover up a true motivation of racial animus. See Burks v. Wis. Dep't of Transp., 464 F.3d 744, 754 (7th Cir. 2006). In making this determination, this court looks at whether the employer's reasons for its decision are honest and genuinely motivated, this court is "not concerned with whether or not the employer's actions were 'mistaken, ill considered or foolish, so long as [the employer] honestly believed those reasons.'" Burks, 464 F.3d at 754, quoting Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000); see also Kodl, 2007 WL 1583989, at *3. Therefore, an employee's attempt to avoid summary judgment cannot succeed unless the employee puts forth evidence suggesting that the employer itself did not believe the proffered reasons for termination. See Burks, 464 F.3d at 754-55. This is because the "the only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs." Kodl, 2007 WL 1583989, at *3. This court concludes that Plaintiff has put forth no evidence that ADM did not believe the proffered reason for terminating Plaintiff.

There is no dispute that Johnson, who is African American, told Philips that Plaintiff refused to take a drug test at the hospital, a fact which was confirmed when Verderber called the hospital. Johnson also told Philips that Plaintiff refused a drug test even after Johnson told him he could lose his job if he did not take the drug test. There is no evidence that Philips did not honestly believe Johnson. In addition, based upon the information Philips received from Johnson and the hospital, Philips believed that Plaintiff had been treated before refusing the drug test  This court therefore agrees with ADM that Plaintiff has not shown pretext and his claim of discrimination cannot survive summary judgment. See Burks, 464 F.3d at 755; Sublett, 463 F.3d at 738-39.

## III. RETALIATION CLAIM

Plaintiff has also claimed that he was terminated in retaliation for engaging in protected

conduct.  In its Motion for Summary Judgment, ADM argues that it is entitled to summary judgment

on Plaintiff's retaliation claim because Plaintiff has not shown that any similarly situated employee

who did not complain of discrimination was treated more favorably and because Plaintiff has not

shown that the reasons given by ADM for Plaintiff's termination were pretextual.  In his Opposition

to ADM's Motion for Summary Judgment, Plaintiff argues that genuine issues of material fact exist

as to his retaliation claim. This court agrees with ADM that it is entitled to summary judgment on

this claim.

Title VII of the Civil Rights Act of 1964 forbids an employer from "discriminat[ing] against"

an employee because that person "opposed any practice" made unlawful by Title VII or "made a

charge, testified, assisted, or participated in" a Title VII proceeding or investigation.  Burlington N.

& Sante Fe Ry. Co. v. White, 126 S. Ct. 2405, 2408 (2006), citing 42 U.S.C. § 2000e-3(a).  To

prevail on a claim of Title VII retaliation under the direct approach, a plaintiff must present evidence

of: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between

the two.  Burks, 464 F.3d at 758.  Plaintiff does not claim to have evidence of causation in this case

and is proceeding using the indirect method.  In order to establish a prima facie case of Title VII

retaliation under the indirect approach, a plaintiff must offer evidence of the following: (1) that he

engaged in statutorily protected activity; (2) that he was performing his job satisfactorily; (3) that

he was subject to a materially adverse action; and (4) he was treated less favorably than similarly

situated employees who did not engage in statutorily protected activity.  Moser v. Ind. Dep't of

Corr., 406 F.3d 895, 903-04 (7th Cir. 2005); see also White, 126 S. Ct. at 2415.[4]  If the plaintiff

_____

[4]  This court is, of course, aware that Plaintiff has included a retaliation claim based upon
42 U.S.C. § 1981.  However, the Seventh Circuit has generally applied that same prima facie
requirements to claims brought under Title VII and § 1981.  See Humphries, 474 F.3d at 403-04.

establishes the prima facie case of retaliation, the burden shifts to the employer for present evidence of a non-discriminatory reason for its employment action. <u>Moser</u>, 406 F.3d at 904. If the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pretextual. <u>Moser</u>, 406 F.3d at 904.

There is no dispute in this case that Plaintiff engaged in protected activity based upon his prior charges of discrimination and participation in the <u>Joyner</u> lawsuit and that Philips and Verderber were aware of Plaintiff's lawsuit against ADM. ADM also does not dispute Plaintiff's ability to establish the second and third elements of the prima facie case. ADM does argue, however, that Plaintiff cannot show the fourth element of the prima facie case, that he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

In his Opposition to ADM's Motion for Summary Judgment, Plaintiff contends that he was similarly situated to Michael Wilder, Wayne Adams, and Robert Cox, none of whom complained of discrimination. This court has already concluded that Plaintiff has not shown that Adams and Cox were similarly situated and treated more favorably. The evidence regarding Wilder shows that he is African American and has been employed by ADM since 1996. On September 18, 2002, Wilder appeared "groggy" and "out of it" and was later found sleeping. Kelm and Chuck Waltrous, Wilder's supervisor, believed that Wilder was under the influence of drugs or alcohol and both felt reasonable cause existed to request a drug test. Kelm then informed Philips about the situation with Wilder. Philips testified that he and Kelm talked to Wilder about it and "asked him what his problem was." Philips testified that Wilder "said that he had marital problems, that he hadn't been sleeping for quite awhile, and that he just felt really bad and he felt like he needed to get some sleep." Philips testified that Wilder denied being under the influence of anything. Philips testified

23

that Wilder's explanations for why he was groggy and sleepy "made sense." Philips testified that he was concerned as to whether they had reasonable suspicion to proceed with a drug test. Philips testified that he told Wilder that "he was either going to take a drug test or he was going to take a 14-day suspension." Philips testified that Wilder chose the 14-day suspension. Philips testified that Wilder had to take a drug test upon returning to the plant after his suspension. Plaintiff has submitted documents from Wilder's personnel record which show that Wilder was involved in a workplace accident on December 3, 2002, has had numerous problems with absenteeism which resulted in numerous written warnings regarding his attendance problems, tested positive for alcohol on two occasions in 2003, and received written warnings for failing to follow through with his treatment recommendations. Plaintiff stated that, despite all of these problems, the documentation shows that Wilder had not been terminated by ADM at least as of June 28, 2006.

ADM argues that Wilder was not similarly situated to Plaintiff. ADM contends that Philips reasonably relied on Johnson's determination that Plaintiff should be drug tested, based upon the suspicious circumstances of his workplace accident, whereas Philips determined that there was no reasonable suspicion for requiring Wilder to take a drug test. Philips testified that there must be "reasonable suspicion" they could prove to an arbitrator before requiring an employee to take a drug test. Philips testified that, being involved in an accident, alone, was not enough to provide reasonable suspicion. Philips testified, however, that Plaintiff was involved "in an accident that caused us to have reasonable suspicion" and refused to take a drug test. Verderber testified that she concluded "it was very odd how [Plaintiff] said the accident happened." ADM notes that, at the time Philips decided to allow Wilder to agree to a 14-day suspension, Wilder had not been involved in a workplace accident and did not incur an injury.

This court concludes that it is clear from the record that Wilder has been treated with incredible tolerance by ADM despite his numerous problems and transgressions.[5]  This court therefore is hesitant to agree with ADM that Plaintiff has not adequately shown that Wilder is similarly situated and was treated more favorably.  However, this court again concludes that Plaintiff has not met his burden to show pretext.

Plaintiff argues that Philips' decision to terminate Plaintiff's employment was clearly pretextual because he did not question Johnson's determination that Plaintiff should be required to take a drug test but questioned Kelm's decision that Wilder should have to submit to a drug test.  Plaintiff also pointed out that there was evidence that Philips decided that Aaron Beasley, another African American employee, did not need to submit to a drug test, even though Kelm thought reasonable cause existed to test Beasley.  Plaintiff argues that "the blatant difference in Philips' treatment of Turner, on the one hand, and Wilder and Beasley, on the other, and the lack of any substantial, credible distinction between their cases, establishes, at a minimum, that genuine disputes of material fact exist regarding pretext."  This court does not agree.

In order to show pretext, Plaintiff must show that the reason given for his termination was a lie used to cover up the true motivation of retaliation.  See Burks, 464 F.3d at 754; Sublett, 463 F.3d 737.  It is not enough for a Plaintiff to show that the reason given was "mistaken, ill considered or foolish."  See Burks, 464 F.3d at 754.  The main problem with Plaintiff's argument is that it is essentially undisputed that Verderber recommended termination and Philips made the decision to terminate Plaintiff's employment based upon the information they received from

---

[5]  However, Plaintiff has provided little evidence regarding Wilder's workplace accident and has only presented his own speculation that Wilder was not required to undergo a drug test following the accident.

Johnson.  It is undisputed that Johnson did not know that Plaintiff filed charges of discrimination or a lawsuit against ADM.

This court concludes that the evidence shows that Philips reasonably relied on Johnson's account of Plaintiff's refusal to take a drug test when he decided to terminate Plaintiff's employment.  Also, despite Plaintiff's lengthy argument to the contrary, there is no evidence that Philips did not honestly believe that Johnson, who could have no retaliatory motive, had reasonably concluded that Plaintiff should be drug tested.  The evidence shows that Johnson made the decision to require Plaintiff to submit to a drug test based upon the rather odd circumstances of the accident under which Johnson could conclude that Plaintiff saw and heard the slow-moving truck and allowed it to hit him.  Based upon the evidence in this case, this court concludes that Plaintiff has not shown that the reason given by ADM for terminating his employment was pretextual.  Therefore, ADM is entitled to summary judgment on Plaintiff's claim of retaliation.

IT IS THEREFORE ORDERED THAT:

(1) ADM's Motion for Summary Judgment [27] is GRANTED.

(2) Judgment is entered in favor of ADM and against Plaintiff on Plaintiff's  Complaint [1].

(3) This case is terminated.

ENTERED this 19th day of July, 2007

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE

26